Estate of Joseph Nemerov, Deceased, Irving A. Nemerov and William T. Nemerov, Executors v. Commissioner.
Estate of Nemerov v. Commissioner
Docket No. 51303.
United States Tax Court
T.C. Memo 1956-164; 1956 Tax Ct. Memo LEXIS 128; 15 T.C.M. (CCH) 855; T.C.M. (RIA) 56164; July 11, 1956
*128 1. The decedent, a lawyer, agreed to undertake work for clients on a contingent basis. The question involves four of such arrangements. He performed some services in each matter prior to his death but did not complete the required services and at the time of his death the issues involved in each matter had not been determined. More than a year after decedent's death, in some instances several years later, the executors received payments of fees for decedent's services, three of which were fixed by court order. Upon the facts, held, that at the time of decedent's death, the value of the decedent's services, in each instance, could not have been determined and there could not have been a quantum meruit recovery. The subsequently recovered fees are not includible in decedent's gross estate. 2. Held, upon the facts, that a decree of a New York Court that the decedent during his lifetime had made a completed gift in trust to a friend, excluded $8,000, which was paid by the petitioners under the court's decree to settle the beneficiary's claim, from the assets of the gross estate, so as to entitle petitioners to deduction of $8,000 under section 812(b)(3), 1939 Code. *130 Nathan D. Shapiro, Esq., 50 Court Street, Brooklyn, N. Y., for the petitioners. John James O'Toole, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in estate tax in the amount of $40,367.22. The deficiency results from several adjustments of the Commissioner increasing the net amount of the estate. During the trial of this case each party made certain concessions to the other to which effect will be given in a Rule 50 recomputation. In the petition, the petitioners made claim for the first time for a deduction of $8,000 which was paid by the estate in settlement of a claim against the estate. There remain for decision two issues, as follows: (1) Whether the decedent, at the time of his death had an interest in four legal fees in four separate causes, which were received after his death, so as to be includible in the gross estate within the meaning of section 811(a), 1939 Code. (2) Whether the estate is entitled to a deduction for $8,000, which petitioners paid in settlement of a claim against the estate, under section 812(b)(3), 1939 Code. Findings of Fact Joseph Nemerov, the decedent, died *131 testate on June 2, 1949, a resident of New York County, New York. The petitioners are the duly appointed and acting executors of the decedent's estate. The decedent's will was admitted to probate by a Surrogate of New York County on June 9, 1949. The estate tax return was filed with the collector of Internal Revenue for the third district of New York on September 1, 1950. For 37 years before his death the decedent was a member of the bar of New York state. He was admitted to practice in various Federal courts and he also practiced before the Interstate Commerce Commission and the Securities and Exchange Commission. The decedent at the time of his death was a member of a law partnership, Nemerov and Shapiro. The decedent reported his income on a cash basis. The accountant's report of the income and expenses of the law partnership for the period from June 2, 1949 to May 31, 1950, when the partnership was liquidated, is incorporated herein by this reference. In determining the deficiency in estate tax, the respondent included in the gross estate a net amount for fees from old cases in the amount of $57,430.12. Petitioners and the respondent now agree that the net fees from the *132 law partnership amounted to $48,000. The respondent agrees that his determination of the amount of this item was excessive to the extent of $9,430.12. Petitioners concede that it is proper to include $48,000 in the value of the taxable net estate. Issue 1: Legal Fees. - (A) New York Central RR. Co. litigation, $3,664.37. - In December 1943 the New York Central Railroad Company brought an action in the New York Supreme Court against the New York and Harlem Railroad Co. and certain minority stockholders for a declaratory judgment. New York Central contended that it was not liable to pay Federal income and excess profits taxes of Harlem. The issue involved interpretation of a lease. Flora Pfeiffer, a minority stockholder, was one of the original defendants and she was represented in the action by the decedent. It was agreed between Pfeiffer and the decedent that no fee was to be paid by Pfeiffer, and that a legal fee for petitioner's services, if there was any fee, would be fixed by the court. In October 1945 the New York Supreme Court dismissed the complaint. In 1947 the Appellate Division affirmed the judgment, and in March 1948 the Court of Appeals affirmed. Thereafter, on *133 June 25, 1948, decedent and other counsel for minority stockholders moved for an allowance of counsel fees. The motion was denied under order dated November 9, 1948, and under a decision of the same date it was held that the attorneys for the minority stockholders, including the decedent, were not entitled to any allowance for counsel fees. From this decision and order, appeal was taken by attorneys for minority stockholders, including the decedent. The appeal was pending at the time of the decedent's death on June 2, 1949. After the death of the decedent, the Appellate Division, on June 28, 1949, reversed the decision and order of November 9, 1948, and referred the proceeding to an official referee. Thereupon, the defendant railroad company, New York and Harlem Railroad Co., appealed from the order of June 28, 1949, and on May 26, 1950, the Court of Appeals affirmed the order of the Appellate Division. During October and November 1950, the official referee held hearings on the petitions of attorneys for fees, which hearings were concluded on November 16, 1950, upon the filing of a stipulation under which the parties agreed to the fixing of fees for attorneys. Under the stipulation, *134 there was allowed a fee for the services of the decedent on behalf of Pfeiffer, and on December 12, 1950, the petitioners, the executors of the decedent's estate, received the net amount of $3,664.37. (B) 121 Varick Street, $321.70. - During his lifetime, the decedent was retained by the owners of premises at 121 Varick Street, New York City, to take all necessary proceedings to reduce the assessed tax valuations of the premises for the tax years 1945-1946 and 1946-1947. There was an agreement between the decedent and this client that the decedent was not to be paid for his services unless a reduction of the assessed tax valuation was obtained; and if a reduction was obtained, he was to receive 33 1/3 per cent of any tax savings. The decedent filed applications for the reduction of the assessed values for the years involved and thereafter "certiorari proceedings" were instituted and filed by the decedent on October 23, 1945, for the tax year 1945-1946; and on October 7, 1946, for the tax year 1946-1947. No hearings were held in these "certioraris" during the lifetime of the decedent. After the decedent's death, the owner of the premises engaged another lawyer, Alexander Berley, who *135 attended hearings before the Tax Commission during 1951, and obtained reductions in the tax assessments for the years 1945-1946, and 1946-1947. The executors of the decedent's estate asserted a claim for legal fees and after negotiations with Berley they received, on October 25, 1951, $321.70, which was paid to the estate of the decedent in satisfaction of the claim for legal fees which was made by the estate. (C) Pittsburgh Railways Co., $8,341.89. - On May 10, 1938, Pittsburgh Railways Co. had filed a voluntary petition for reorganization under Section 77(b) of the Bankruptcy Act in the United States District Court for the Western District of Pennsylvania. In October 1944 while these proceedings were still pending and undetermined, the decedent was retained to represent some owners of securities in Pittsburgh Railways Co. in the hearings. It was agreed by the individuals and the decedent that no fee was to be paid by them to the decedent, and that if he were to receive any legal fee, application therefor would be made to the court and the court would fix the fee to which the decedent might become entitled in accordance with the law and procedure in bankruptcy and reorganization *136 cases. The decedent engaged a law firm in Pittsburgh to act as counsel, and he also retained a New York attorney, M. J. Dix, to collaborate in the proceedings. These attorneys were to share in any fees which might be awarded. On July 1, 1949, after the decedent's death, a plan for reorganization of Pittsburgh Railways Co. was prepared and submitted to the necessary parties. Prior to July 1, 1949, during the decedent's lifetime, there were several hearings and appeals in which the decedent participated under his agreement with the security holders who had retained the decedent. After July 1, 1949, hearings were held from time to time on the plan of reorganization, and on March 27, 1950, the Securities and Exchange Commission approved the plan, and on May 1, 1950, the United States District Court approved the plan. After May 1, 1950, the District Court held several hearings on applications for fees. The executors of the decedent's estate retained a Pittsburgh attorney, A. H. Berkman, to represent the estate of the decedent in the hearings on the applications for fees. Finally, by an order dated June 30, 1952, the District Court made awards of fees; $40,000 to the Pittsburgh law *137 firm which the decedent had retained; $90,000 to the New York lawyer, Dix, whom the decedent had retained; and $15,000 to the estate of the decedent. Also, the court allowed an award of $1,000 moneys which had been advanced by the decedent. The executors were dissatisfied and asked leave of the Circuit Court of Appeals for the Third Circuit to appeal from the allowance of the District Court. The application was denied on August 6, 1954. The reason the executors of petitioners' estate wee dissatisfied with the District Court's allowances of fees for the services of all of the associated attorneys, including the decedent, is as follows: On August 22, 1951, the executors of the decedent's estate entered into an agreement with Dix and the Pittsburgh law firm, Pritchard, Lawlor, Malone & Geltz, in which it was agreed that the total fees which might be allowed thereafter by the District Court would be pooled and shared proportionately; Dix would receive 37 1/2 per cent; the Pritchard law firm, 37 1/2 per cent; and the estate of Joseph Nemerov would receive 25 per cent. Because of their dissatisfaction, the executors commenced a special proceeding in the District Court in Pittsburgh, petitioning *138 the court to direct Dix and the Pritchard firm to comply with the agreement of August 22, 1951. The District Court dismissed this special proceeding on June 22, 1954, and, as stated above, the Court of Appeals for the Fifth Circuit denied petitioners' application for leave to appeal on August 6, 1954. On October 6, 1952, the executors of the decedent's estate received from the trustees of Pittsburgh Railways Co. the allowance for fees of $15,000, and the sum of $1,000 for reimbursement for advances by the decedent. The executors paid A. H. Berkman, and others, $6,658.11 for legal fees and disbursements in connection with a dispute they had had with the attorney, Dix, and in connection with the application for allowances. The executors have not received and are not entitled to receive any further moneys in the Pittsburgh Railways matter. After paying $6,658.11 to Berkman, the executors had left out of the allowance of $15,000, the sum of $8,341.89. The petitioners concede that the payment of $1,000, reimbursement for moneys advanced by the decedent, is includible in the gross estate. The respondent concedes that with respect to fees in the Pittsburgh Railways Co. matter, he erroneously *139 included in the value of the gross estate $21,250. There remains in dispute between the parties in this matter $8,341.89, which amount was received by the petitioners on October 6, 1952. (D) American Light and Power Co., $40,500.67. - In September and October 1946, the decedent was retained by Paul Shanik, an attorney, as Shanik's attorney, and by other holders of common stock of American Power and Light Company and of Electric Bond and Share Company, as well as by the Special Protective Common Stockholders Committee of American Power and Light Company, to appear to object to a proposed joint plan (the 1946 plan) of American Power and Light Company (hereinafter called American), and of Electric Bond and Share Company (hereinafter called Electric), under Section 11 of the Public Utility Holding Company Act of 1935, to retire preferred stock of and to settle certain claims against American. It was agreed that no fee would be paid to the decedent by those who retained him, and that if the decedent became entitled to any fee, the fee would be fixed by the Securities Exchange Company (hereinafter called S.E.C.), pursuant to prescribed procedures under applicable law. Shanik acted as associate *140 counsel with the decedent. American was a public utility holding company having a portfolio of assets of about $250,000,000. For the purpose of obtaining necessary accounting and statistical assistance, the decedent engaged Theodore R. Mackoul as a financial accountant and consultant. Also, the decedent enlisted the cooperation of another attorney, Louis Kipnis. The 1946 plan of American was withdrawn as a result of opposition of the Special Protective Committee which opposition was guided by the decedent. On April 8, 1948, a new joint plan of American and Electric was filed. Hearings on the 1948 plan began on May 25, 1948, in Washington, D.C. and continued until August 27, 1948. The decedent engaged Leo B. Mittelman, another attorney, to attend the hearings in Washington. Following the completion of the hearings, and after the decedent's death, a compromise plan was approved by S.E.C. on September 22, 1949. From October 3, 1949 until November 7, 1949, various events transpired pursuant to the approval of S.E.C. relating to the compromise plan which lead up to the hearing on the compromise plan on November 7, 1949 in the United States District Court for the Southern District *141 of New York. Among the several intervening steps which were taken was the issuance of an order of the S.E.C. on October 4, 1949, approving the compromise plan in which order the S.E.C. reserved, inter alia, jurisdiction over the payment of fees and expenses already incurred or to be incurred. On November 14, 1949, after a hearing on November 7, 1949, the order of the District Court approving the above-mentioned plan was entered. The compromise plan provided that American would pay all legal fees and expenses approved by the Commission. In June 1949, following the death of Joseph Nemerov, the law firm of Nemerov & Shapiro was substituted by the Protective Committee as its counsel. Mittelman remained as associate. Shanik and Kipnis continued to act in the matter. Neither the decedent nor the firm of Nemerov & Shapiro filed any application with S.E.C. for legal fees or disbursements. On March 2, 1950, by an agreement in writing, Mittelman agreed to prepare, file, and, if necessary, argue on a joint application for allowances for fees for services rendered and expenses incurred in the reorganization proceedings by the decedent and the members of his staff, by Kipnis, by Mittelman, *142 and by the firm of Nemerov & Shapiro and its staff. Mittelman agreed to render all services that might be required in behalf of the application. Under the above agreement of March 2, 1950, Shanik was to receive 11 per cent of the gross allowance for legal fees, Mittelman was to receive 37 1/2 per cent of the remaining sum, after certain deductions, and the balance was to go to the estate of Joseph Nemerov. Also, all reimbursement of expenses was to go to the estate of Joseph Nemerov. Notwithstanding the agreement of March 2, 1950, and in violation and breach thereof, Mittelman filed with S.E.C. an application for an allowance solely on his own behalf, in which he requested S.E.C. to allow him the sum of $200,000 as compensation for his legal services. The application was filed on September 27, 1950, without the knowledge or consent of the executors of Nemerov's estate who are the petitioners here. By reason of the breach of the agreement by Mittelman, the executors of the Joseph Nemerov estate, Shanik, and the firm of Nemerov & Shapiro commenced an action in the Supreme Court of New York on November 9, 1950, to restrain Mittelman from violating the terms of the agreement of *143 March 2, 1950, and from prosecuting his personal application for an allowance in violation of the agreement. In that action the plaintiffs demanded judgment and asked the court to determine, construe, and declare the precise rights and the legal relationship of the plaintiffs and Mittelman under the agreement. In addition, the petitioners made an application, dated November 9, 1950, to S.E.C. to stay Mittelman from violating the terms of the settlement agreement of March 2, 1950. The Supreme Court proceedings were settled by an agreement whereby Mittelman agreed to file a joint application in place of the individual application theretofore filed by him. Thereafter, pursuant to this new agreement on about December 5, 1950, Mittelman filed a joint application with S.E.C. for an allowance for fees on behalf of himself, Shanik, Kipnis, the decedent's estate, and the firm of Nemerov & Shapiro. It was then agreed that the estate should receive 50 per cent of the fees allowed by S.E.C. under the joint application. During the month of January 1951, hearings were held by S.E.C. upon the application in which all parties concerned participated, Shanik, the firm of Nemerov & Shapiro, Nathan *144 D. Shapiro, attorney for the decedent's estate, Kipnis, and Mittelman. On about October 1, 1952, the S.E.C. awarded a gross legal fee of $110,000 but directed that the decedent's estate, Kipnis, and Nemerov & Shapiro should receive not more than a 45 per cent share thereof by reason of the fact that any fee payable to the estate and to Kipnis and to Nemerov & Shapiro in excess of 45 per cent would constitute an unreasonable distribution of legal fees. On September 11, 1952, petitioners agreed to accept 45 per cent of the fee of $110,000 for itself, the firm of Nemerov & Shapiro, and Kipnis. On October 7, 1952, the petitioners received and paid out the following moneys in the American Power & Light Co. case: RECEIVED l45 per cent of gross fee of
$110,000
$49,500.00
Disbursement allowed to Nemerov
& Shapiro
1,000.00
Disbursement allowed to petitioner
by SEC
10,417.09
Total
$60,917.09
PAID OUT
Allowance to Louis Kipnis
$2,500.00
Allowance to Nemerov &
Shapiro
5,841.70
8,341.70
Net, before the following disburse-
ments
$52,575.39
DISBURSEMENTS
Nathan D. Shapiro
$ 124.78
Nemerov & Shapiro, Mack-
oul collection
440.00
Ace Reporting Co.
92.85
657.63
Balance
$51,917.76
*145 The above schedule shows that S.E.C. awarded $11,417.09 as reimbursement of disbursements. The parties agree that of this sum, $1,000 was paid through the Nemerov & Shapiro partnership, and the petitioners concede that $10,417.09 is includible in the gross estate of the decedent. Accordingly, the net amount of the legal fee which is in dispute in the American Power & Light matter is the net amount of $40,500.67, after deducting $8,999.33 (disbursements to Kipnis, the Nemerov law firm, and others) from $49,500. To summarize the facts relating to items A, B, C, and D, supra: In each of the four matters above-described, none of the causes had proceeded to a determination or decision, and in none had the required legal services to bring the cause to a determination or decision been completed before the death of the decedent. In order to bring each of the causes to the point of completion, attorneys other than the decedent rendered services after the death of the decedent, and the participation of the decedent in each was only part of the entire amount of legal services required and supplied. The decedent died before he had prosecuted to completion, settlement, or judgment the legal *146 services which he undertook to perform but was unable to perform to completion. The decedent did not file any claim for compensation for services which he had rendered prior to his death in any one of the four matters, except in the New York Central RR. litigation where a motion which was filed was denied. In none of the matters was any compensation for the decedent's services agreed upon in advance. Rather, he undertook and volunteered services in each matter on a wholly contingent basis. As of the time of the decedent's death, no value could be placed upon the services which he had rendered in each matter up to the time of his death. There were no statutorily fixed fees to which he could have made claim at the time of his death. At the time of the decedent's death, his legal services rendered in each of the four matters up to that time had no market value, and at that time the services which the decedent had rendered in each matter were not compensable. Issue 2: Alleged Trust for D. Foster. - The decedent never entered into the bonds of matrimony. During his lifetime, decedent had a friend, Diana Foster. On June 14, 1950, Diana filed a complaint in the Supreme Court of New *147 York against the executors of the estate of the decedent in which it was alleged that for many years prior to the decedent's death, and up to the time of his death, Diana and the decedent had enjoyed a mutual relationship of trust, confidence, devotion, love, and affection; that in about June 1935, the decedent created a trust for the benefit of Diana, wherein he designated her the beneficiary, and himself the trustee, and declared that he would hold in trust for her benefit cash in the amount of $10,000, which he had in his possession. It was further alleged that the decedent had added cash and securities to the trust, that the corpus of the alleged trust had a value of $250,000 at the time of the decedent's death, and that the executors of the decedent's estate had failed and refused to honor the plaintiff's claim and pay over to her the corpus of the alleged trust or any part thereof. It was alleged further that the plaintiff had no adequate remedy at law. The executors filed an answer denying the material allegations in the complaint. On April 28, 1952, there was trial at which testimony on the part of Diana was submitted. On May 9, 1952, the Supreme Court entered an interlocutory *148 judgment in which the following were decreed, inter alia: "ORDERED, ADJUDGED and DECREED that the defendants, as Executors of the Estate of Joseph Nemerov, deceased, account to the plaintiff for the proceeds of an express parol trust created by said Joseph Nemerov, deceased, for the plaintiff; * * *
"ORDERED, ADJUDGED and DECREED, that upon the taking and stating of the account of the defendants, the plaintiff may recover from the defendants, such sum as may be found to be due her from the Estate of Joseph Nemerov, deceased, and costs, interest and disbursements may be applied for in the final judgment to be entered herein; * * *" After entry of the interlocutory decree and under the direction of the justice presiding at the trial, the executors paid the sum of $8,000 to Diana on June 2, 1952. The sum of $8,000 was paid by the executors as the result of a settlement entered into in open court on May 27, 1952. The settlement stipulation provided as follows: * * *
"This settlement proceeds from a conference this morning in open court wherein the practical considerations affecting this case were brought to the attention of counsel, and because of such considerations *149 and for no other reason, this settlement has been made."
Between April 20, 1950 and July 16, 1951, the petitioners made payment aggregating the sum of $115,972.02, on account of the Federal estate taxes. The executors of the decedent's estate elected to have the gross estate of the decedent valued in accordance with the provisions of section 811(j), 1939 Code. None of the legal fees in question were received by the executors of the decedent's estate within one year after decedent's death. The stipulation of facts is incorporated herein by this reference. Opinion HARRON, Judge: Issue 1: The first question is whether the value at the date of decedent's death of legal fees, or the amounts of fees actually received by the estate of Joseph Nemerov, deceased, in 1950, 1951, and 1952, more than one year after the date of the decedent's death, are includible in the gross estate. The executors of the estate collected, more than one year after the decedent's death, a share of fees in four cases in which the decedent had rendered some services. Upon all of the facts, it must be concluded that in each instance the amounts received by the executors were to no extent realizations of the *150 values of actual or inchoate rights of the decedent which existed at the time of death. The services that had been performed before death were not compensable as of the time of decedent's death or within one year thereafter. There could have been no quantum meruit recovery since each case was taken on a contingent basis. The above is obvious with respect to item B, 121 Varick Street, where the service to be performed by the decedent was to endeavor to obtain reduction in the assessed valuations of the property. All that the decedent did was to file "certiorari proceedings." After his death, the owners of the property engaged another lawyer and eventually the new lawyer completed the work required in the matter. At the time of the decedent's death there was no accrual of whatever amount, if any, the decedent's limited services in the matter were worth. His fee for services was wholly contingent upon the obtaining of a reduction in taxes. The petitioners finally received $321.70 in 1951, as payment for decedent's limited services, but only after negotiating with the attorney who succeeded Nemerov. In the New York Central RR. and Harlem Railroad Co. matter (Item A), decedent was retained *151 on a contingent basis. The decedent was not to receive any fee unless one was awarded under a court decree or order. On November 9, 1948, the court having jurisdiction in New York denied a motion of attorneys, including the decedent, for fees. Decedent died on June 2, 1949. At that time no right to a fee for legal services had accrued and at that time, as the facts show, there could not have been any quantum meruit recovery. In the other two matters involving the Pittsburgh Railroad and the American Power and Light Co., (C) and (D), no plan had been approved as of June 2, 1949, at the time of the decedent's death. In both cases, the statutory procedures applicable to each one provided that the matter of attorney's fees was for a District Court to determine after hearings on applications for fees, and under those procedures, applications for fees could not be made until a United States District Court fixed the time for filing such applications. See . The facts establish that at the time of the decedent's death, the precedent contingency, in each instance, had not occurred under which the right to fees had accrued, and that at the *152 time of the decedent's death no quantum meruit claim for fees could have been made. The decedent reported his income on a cash basis. The facts relating to all four matters and particularly to the proceedings involving the Pittsburgh Railways Company and the American Power and Light Company, establish that the net benefit accruing to the decedent's estate, at the time of his death and one year later, for the decedent's services in each matter up to the time of his death could not have been evaluated for the purpose of including the fees or the value of decedent's services in the decedent's estate. Cf. ; . The facts relating to all four matters are such that this case is distinguishable, in our opinion, from , reversing . See , where it was observed that neither a taxpayer nor a revenue officer could do any more than guess at the value of the contingency involved in that case. The same may be said here with equal propriety. Under *153 this issue, the respondent's determination that fees received by the estate after the decedent's death are includible in the gross estate is reversed. Issue 2. - The petitioners seek either a deduction or an exclusion from the gross estate of $8,000 for the claim of Diana. Section 812(b)(3), 1939 Code, provides in part that "* * * The deduction herein allowed in the case of claims against the estate, * * *, or any indebtedness shall, when founded upon a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; * * *" The respondent argues that there is no evidence here establishing that the claim of Diana is based upon adequate and full consideration in money or money's worth. Petitioners rely upon the interlocutory judgment of the Supreme Court of New York which decreed that an express parol trust was created by the decedent for Diana and ordered the executors of his estate to render an accounting of the proceeds in the oral trust. Petitioners rely upon Rosenman v. United States, 53 Fed. (2d) [Supp.] 722, reversed on another issue, . Upon *154 consideration of the evidence before us, we believe that this issue comes within the Rosenman case. The complainant, Diana, claimed that the decedent had created an oral trust during his lifetime for her benefit in the amount of $10,000. There was trial upon her complaint, evidence was adduced, and the Supreme Court of New York sustained the claim that an inter vivos, oral trust had been created. In the Rosenman case, the son of the decedent claimed that his father had made an inter vivos gift to him of securities having a value of $167,000. There was no litigation in court of the issue about the alleged gift to the son. Instead, the executors negotiated a settlement and paid the son $25,000. Thereupon, a petition was filed by the executors in the Surrogate's Court asking for approval of the settlement on the basis of their opinion that the deceased had in fact made a gift to his son during his lifetime. Here, the question of whether the decedent made a gift in trust for the benefit of Diana was litigated, and the court decreed that a gift had been made under an oral trust. The court ordered the executors of the decedent's estate to render an accounting to Diana, as the beneficiary *155 of the trust, of the proceeds of the oral trust. The executors rendered such accounting and thereafter the parties agreed that the amount to which Diana was entitled under the oral trust was $8,000. The facts here closely resemble the facts in the Rosenman case. The executors of Rosenman's estate were allowed deduction of $25,000 for the claim against the estate which they had paid. The court concluded that "* * * The judgment of the Surrogate's Court approving the settlement of $25,000 had the effect of excluding from the gross assets of the estate so much of the securities which the executors had been administering." The above conclusion of the court was founded upon the premise that a completed gift had been made, inter vivos, by the decedent. The same reasoning is proper here, unless we ignore and give no effect to the judgment and decree of the Supreme Court of New York. That decree was made in a contested, adversary proceeding; it did not follow from a nonadversary proceeding. Furthermore, the court made a determination of a property interest, and the rule to be followed here is that under such circumstances effect shall be given to the adjudication by and the decree *156 of a state court. It is held that the decree of the Supreme Court of New York and its approval of the settlement of the executors under that decree had the effect of excluding from decedent's gross estate assets which the executors had been administering to the extent of $8,000. Under this issue the petitioners are sustained. Decision will be entered under Rule 50.